IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DANIIL V. ZHUK,

         Petitioner,                    No. CIV S-09-3073 MCE CHS

    vs.

MIKE McDONALD,

         Respondent.        <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

## I.  INTRODUCTION

Petitioner Zhuk, a state prisoner, proceeds through counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Zhuk stands convicted of first degree murder and other offenses in the Sacramento County Superior Court, case number 00F02479, for which he is currently serving a sentence of life in prison without the possibility of parole.

## II.  BACKGROUND

Zhuk and a co-defendant were charged with various crimes stemming from three separate incidents involving unsuccessful attempts to steal automobiles and/or assaults upon victims in vehicles.  One of the incidents resulted in the death of a young victim, Cindy Chung.

    A.      Murder of Cindy Chung

On the afternoon of January 20, 2000, seventeen-year-old Zhuk drove with co-

1

defendant Mikhael Vlasov and another passenger in his car.  They spotted Cindy Chung driving a BMW on the freeway and followed her car until she parked at her father's auto body shop. Cindy entered the office of the auto body shop for about 10 minutes and then returned to her car as her father, Han Chung, locked the office door.  Armed with a .22 caliber handgun, Vlasov exited the vehicle and walked past Han around the corner toward where Cindy was parked. Almost immediately Han heard two gunshots and saw Vlasov run past him.  Han saw Cindy's car smash into a fence and called 911.  Vlasof returned to Zhuk's car and they drove away.  Cindy was dead when officers arrived at the scene.

Vlasof and the third passenger testified that Zhuk had said he knew people who would pay $3,000 to $4,000 for a BMW or a Mercedes and suggested stealing a car and splitting the money.  According to those two, Zhuk gave the gun to Vlasof and instructed Vlasov to run up to the driver of the car, stick the gun in her face, and take away the car.  Vlasov testified he discharged the gun accidentally.  Zhuk, however, denied knowledge of the gun and denied being part of any plan to steal the car.

The owner of a nearby shop had noticed a suspicious car in front of his shop on the day of the shooting.  After learning of Cindy's murder, the neighboring shop owner called the police and provided information to create a sketch of the driver, which was published in newspapers, including a Russian language newspaper.

On March 20, 2000, Zhuk's father saw a sketch of the suspect in the Russian newspaper coverage of Cindy's murder.  The picture looked like Zhuk.  The following day Zhuk's father accompanied him to juvenile hall to speak with law enforcement.

Around the time of the shooting, Zhuk showed a gun to a friend from school and told her that he stole cars.  The day after Cindy's murder, Zhuk told the friend that he had gone to steal a car, but there was a woman who did not want to get out of the vehicle and she ended up dead.

/////

2

1          B.      Attempted Carjacking of Ingrid Wolbart

2          The night before Chung's murder, on January 19, 2000, Ingrid Wolbart was the

3    victim of an attempted carjacking by a lone assailant displaying a firearm.  Wolbart did not

4    cooperate with the assailant's demands, and the assailant fled.

5          After learning of Cindy Chung's murder, Wolbart notified police of the incident.

6    She described her assailant as a white man with a small build, approximately five feet six inches

7    tall.[1]  In separate photo lineups, she identified both Zhuk and Vlasov as the possible perpetrators

8    but was more certain about the selection of Zhuk's photo.  At trial she identified Zhuk as the

9    assailant.

10         C.      Attempted Carjacking of Karen Wood

11         Zhuk admitted that, on February 23, 2000, he attempted to steal Karen Wood's

12   Mercedes.  As she put her key in the ignition, Zhuk approached her, said he had a gun, and

13   ordered her out of the vehicle.  She got out of the car and Zhuk got into the driver's seat.  Wood

14   still had the key, however, and ran away.  As she was running away, she saw Zhuk running off in

15   a different direction.  Wood never saw a gun.

16         Wood identified Zhuk as the attempted carjacker in a photo lineup and at trial.  A

17   fingerprint from the driver's side door of Wood's car matched Zhuk's print.

18         D.      The Trial and Appeal

19         Zhuk and Vlasov were tried together with separate juries.  As set forth, Zhuk

20   claimed Vlasov was solely responsible for Cindy Chung's death; Vlasov admitted to the shooting

21   but testified it was an accident instigated by Zhuk.  Vlasov also testified that he attempted

22   another carjacking at Zhuk's request nine days after Cindy Chung's murder.

23         Both Zhuk and Vlasof denied any involvement in the attempted carjacking of

24   Wolbart's car.  Zhuk testified Vlasov told him about an incident similar to Wolbart's version of

25   _____

26         [1] At the time of arrest, Zhuk was six feet tall and weighed between 150 and 155 pounds.
     Vlasov was five feet three inches tall.

events.  Zhuk provided an alibi for the evening in question and the parties stipulated that Zhuk had placed a missing person call to police at a gas station located a considerable distance from the location where Wolbart was accosted.

Zhuk admitted that he attempted to steal Wood's car.

Zhuk's jury acquitted him of the attempted offense against Wolcott but found him guilty of attempted carjacking against Wood and of attempted robbery and special circumstance murder under a theory of felony murder as to Cindy Chung.  The court sentenced him to life without the possibility of parole plus a consecutive term of three years and six months.[2]

After conviction, Zhuk filed a motion for new trial based on alleged juror misconduct.  Supported by the declarations of two jurors, the motion alleged that the jurors had engaged in misconduct by bartering their votes to reach a compromise verdict and improperly considering extraneous information.  The trial court held a hearing and denied the motion.

Zhuk appealed his convictions to the California Court of Appeal, Third District, where the judgment was affirmed in an unpublished decision.  The California Supreme Court denied a petition for review.

### III.  GROUNDS FOR RELIEF

Zhuk claims that the jurors committed prejudicial misconduct during deliberations (grounds one and two) and that the trial court made an instructional error with respect to the murder charge (ground three).

### IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States.

---

[2] Vlasov was convicted of the first degree murder during commission of attempted carjacking, attempted kidnapping to commit robbery, attempted robbery, attempted carjacking, and assault with a firearm in relation to these incidents and one additional unrelated incident. Vlasov was sentenced to life without parole for the murder, plus 25 years to life and a consecutive determinate term of 27 years to life.

28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)). This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999). Under the AEDPA, federal habeas corpus relief is also precluded for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

This court looks to the last reasoned state court decision to determine whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002), *cert. dismissed*, 538 U.S. 919. The state court's factual findings are presumed correct if not rebutted with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Taylor v. Maddox*, 336 F.3d 992, 1000 (9th Cir. 2004). It is the habeas corpus petitioner's burden to show the state court's decision was either contrary to or an unreasonable application of federal law. *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002).

V.  DISCUSSION

A.  Juror Misconduct (Grounds One and Two)

1.  Additional Background

Following his conviction, Zhuk obtained declarations from two jurors in support of a motion for a new trial premised on alleged juror misconduct. Juror No. 3 declared:

I was one of the jurors in the Daniil Zhuk case and was seated in the #3 position.

As the jury deliberations progressed, at least five to six of the jurors, including myself, had voted that Daniil Zhuk was not guilty of the murder charge.  A question was then sent to the judge asking if it was permitted for us to find Daniil not-guilty of murder, but guilty of the remaining charges regarding the Cindy Chung matter.

While the response of the Court to that question was 'yes,' there was also a statement that we should look at certain other jury instructions that had been given us.[3]  This was interpreted by some as an instruction by the judge to find Daniil Zhuk guilty of murder.

One of the other jurors had been employed for a long time as a secretary for a legal firm.  Because of her work, she said that she had special legal expertise and knew the law.  Because of that, and the judge's response to our inquiry, she told us that we had to find Daniil Zhuk guilty of the murder charge.

We were told repeatedly that we could not find Daniil guilty on the attempted carjacking and attempted robbery charges, Counts two and three, and find him not-guilty on the murder charge, Count one.  The verdict on all of the three counts had to be the same.  She said that we could not change the law, the law is as it is, we cannot analyze the law, and we have to find Mr. Zhuk guilty of murder.

This juror also told us that she had a cousin who was murdered with a handgun similar to that used in the Chung shooting.  She went into detail describing the facts of her cousin's killing.  She compared those facts with those of the Zhuk case and equated the murder of her cousin to this case.  She told us that because these cases had similar facts and circumstances, because of the judge's answer to our question, and due to her legal expertise, we must find Daniil Zhuk guilty of murder.

This same juror, and others, said that the judge would not like a 'hung jury.'  It was discussed that with a hung jury, Daniil Zhuk could possibly receive a worse sentence if he were tried later by another jury than if we just found him guilty of the murder.  These jurors were also added [sic] that they did not want the Chung family to have to go through another trial.  We had to reach a verdict to give the family closure.

There was a group of jurors who were voting guilty on all of the charges.  They agreed to change their votes on the two counts concerning Ms. Wolbart if we would change our votes to guilty on

---

[3] The trial court directed the jury's attention to the previously furnished instruction on felony murder.

1    the murder charge.

2    Although we were not the jury for Mr. Vlasov, we heard testimony
     concerning his role in the young lady's death and were convinced
3    that he had shot and killed Ms. Chung.  Although I was still certain
     that Mr. Zhuk was not guilty of the murder charge, but as we were
4    convinced of Vlasov's guilt, we wanted to send a message to the
     other jury to convict him.  Because of that, of the pressure put on
5    us by the legal expert, of the agreement to vote not-guilty on the
     Wolbart matter, others and myself who had previously voted not
6    guilty on the Daniil Zhuk murder charge changed our votes to
     guilty to make sure that Mr. Vlasov would be found guilty of this
7    murder.

8    Lastly, it was known that one juror feared that if the jury
     deliberations continued any longer, she would lose her job.  Others
9    talked of having vacations awaiting them and wanted the
     deliberations to wrap up.

10

11   (Reporter's Transcript ("RT") at 1677-78.)  Juror No. 5 similarly declared:

12   I was a juror in the Daniil Zhuk trial and was in the # 5 seat.

13   After the start of our jury discussions four or five of us jurors had
     voted that Daniil Zhuk was not guilty of murder.  As the jury was
14   not agreeing on this charge, a question was sent to the judge asking
     if it was alright to find Daniil not-guilty of murder, but guilty of
15   two of the remaining charges.  These were the first three counts.

16   The judge answered 'yes,' to the question, but also said that we
     should look at some of the other jury instructions which were put
17   in his reply.

18   From the judge's reply, I felt that I could still find Daniil not-guilty
     of the murder.  One of the jurors, ... who was juror # 6, had told us
19   that she worked for an attorney for many years. She said that she
     knew the law and because of how the judge had replied to the
20   question sent him, we had to find Daniil Zhuk guilty of murder.
     She said it was a legal impossibility to find Daniil guilty of the two
21   charges and not guilty of the murder.  She said that 'the law is the
     law, I've been in juries before, and I know all about the law.'
22
     At this time, there were at least five of us who were voting guilty
23   on the attempted car-jacking and attempted robbery counts, but not
     guilty on the murder charge. The rest of the jury, led by Juror # 6,
24   said that we could not do that.

25   Juror # 6 also told all of us about one of her relatives, a cousin,
     who had also been murdered. She talked about how her cousin
26   died, going into detail in comparing the facts of her cousin's

7

murder with those of the Korean girl in this case. The shootings were very similar including involving a car [and] the type of gun used. Because they were so similar, and because she was this legal expert, she told us that we had to find Daniil guilty.

We also discussed the fact that Mr. Vlasov had killed the young lady and needed to be found guilty of her murder. We also talked about how if our jury could not come to a verdict on the Zhuk case because some of us were voting not-guilty, it was possible that Daniil would be worse off if another jury found him guilty.

Some of the jurors were complaining how things were taking too long. Although some were worried about their vacations, several of us did not want the deliberations to end for that reason. However, we kept hearing time after time how others just wanted to wrap things up and leave.

Because there were a number of us who were voting not-guilty on the murder charge, others who were voting guilty on all of the charges offered to trade votes to get the case resolved. This was done on the blackboard showing how the votes were on each of the counts. Finally, some of the jurors agreed that they would trade a not-guilty vote on the Wolbart matters for a guilty verdict on the murder count.

At the end we talked about sending a message to the Vlasov jury to make sure that he was found guilty of the murder. The only way that we could make sure that Mr. Vlasov would be held responsible for the killing was by finding Daniil Zhuk guilty. Although I felt that he was not guilty, to send that statement to the other jurors and make sure that Vlasov was convicted, I changed my vote to find Daniil Zhuk guilty of the murder charge.

(RT at 1646-47.)

The trial court held a hearing on Zhuk's motion for a new trial. The prosecutor filed a brief objecting to the admissibility of some of the language in the declarations. Applying section 1150 of the California Evidence Code,[4] the trial court ruled inadmissible Juror No. 5's

---

[4] Section 1150 provides, in relevant part:

Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, or event upon a juror either in

1    statement "Finally some of the jurors agreed that they would trade a no-guilty vote on the

2    Wolbart matters for a guilty verdict on the murder count." *People v. Zhuk*, *supra*, at 11.  The

3    trial court found the allegations of vote trading "particularly worrisome" but noted that

4    "frequently juries reach verdicts by way of compromise."  *Id*.  After reviewing the case law, the

5    trial court found that the "offer and discussion with regard to the trading of votes is not the type

6    of misconduct or is not considered misconduct under the law and... therefore would not be

7    prejudicial."  *Id*.  The trial court reasoned that Juror No 3's verdict was not "a tit for [tat] kind of

8    situation" because "there were other extrinsic factors at work and other elements to her decision."

9    *Id*.  In addition, even if Juror No 5's statements on the trading of votes showed misconduct, "it

10   was only a factor that apparently was at work in the mind of one of these jurors... along with...

11   other multiple factors."  *Id*.

12          The trial court found that Juror No. 6's statements about her legal background and

13   experience with a similar crime did not constitute misconduct; the court was not persuaded she

14   had provided "extraneous or erroneous legal advice."  The trial court reasoned:

15          When the jury argues a matter as this jury was doing, they
             incorporate both their assessment of the facts and apply those facts
16          to the law.  The Court, in answering the question, properly
             identifies what the law is, based on factual determinations that this
17          or any one of the jurors could make, it would be legally impossible
             to find Mr. Zhuk guilty of Count 2 and 3 and not find him guilty of

18

19          influencing him to assent or to dissent from the verdict or
             concerning the mental processes by which it was determined.
20

21   Cal. Evid. Code § 1150. The purpose behind the rule of section 1150 is to "prevent[ ] one juror
     from upsetting a verdict of the whole jury by impugning his own or his fellow jurors' mental
22   processes or reasons for assent or dissent." *People v. Hutchison*, 71 Cal.2d 342, 350 (1969).  The
     only improper influences that may be proved under section 1150 to impeach a verdict, therefore,
23   are those open to sight, hearing, and the other senses and thus subject to corroboration." *Id*.

24          As will be discussed, a similar federal rule exists.  *See Sassounian v. Roe*, 230 F.3d 1097,
     1108 (9th Cir. 2000) ("A long line of precedent distinguishes between juror testimony about the
25   consideration of extrinsic evidence, which may be considered by a reviewing court, and juror
     testimony about the subjective effect of evidence on the particular juror, which may not.")
26   (citing, *inter alia McDonald v. Pless*, 238 U.S. 264, 267-68 (1915) (noting that the finality of
     verdicts necessarily precludes using evidence of jurors' mental processes to impeach verdicts)).

1    murder.  It would be a correct and proper argument to make.
      Indeed, when I get to the issue of prejudice, I think the entirety of
2    the record would compel an objective jury to reach that conclusion,
      although that is not controlling....

3

4    *People v. Zhuk*, *supra*, at 13.  As to the question of prejudice from Juror No. 6's statements, the

5    trial court noted it had properly responded to the jury's question, and that

6    [t]he lady, consistent with these [juror] declarations, could very
      well argue that if there was, and the weight of the evidence, I
7    believe would so support, a robbery within or attempted robbery
      within and a murder within the course of that robbery, that the
8    felony-murder rule applied and that they were compelled, even
      though they clearly did not want to, to return a verdict of guilty on
9    Count 1. And when you look at it in that context and with an
      objective person standard as Carpenter and these other cases
10   require, this does not rise to the level of prejudicial conduct,
      assuming it is misconduct, such as to necessitate a new trial.

11

12   *People v. Zhuk*, *supra*, at 14.

13         The trial court disregarded the portions of the declarations alleging an attempt by

14   the jurors to send a message to the Vlasov's jury.  The court found these statements were

15   reflective of other juror's thought processes and therefore not admissible; in the alternative, if

16   admissible, the statements were not prejudicial.  The trial court found the jurors' comments about

17   the possibility of a hung jury and a harsher sentence on retrial did not amount to misconduct.

18         On appeal, the state court agreed with the trial court that only Juror No. 6's

19   comments constituted misconduct; the state appellate court also agreed that the comments did not

20   cause prejudice.  Zhuk's claim of juror misconduct was denied.

21                    2.      Jury Misconduct Analysis (Grounds One and Two)

22         At the outset, despite Zhuk's insistence to the contrary, the standards of AEDPA

23   apply.  Zhuk's argument that the state appellate court failed to reach the merits of his jury

24   misconduct claims for AEDPA purposes is flatly wrong.  *See Early v. Packer*, 537 U.S. 3, 8

25   (2002) (explaining that no citation or awareness of Supreme Court precedent need appear in the

26   state court decision, so long as neither the reasoning nor the result of the state court decision

1   contradicts such precedent).  Moreover, section 2254(d) applies even where independent review

2   of the record is warranted.  *Greene v. Lambert*, 288 F.3d 1081, 1089 (9th Cir. 2002).

3                          a.  Vote Trading/ Compromise Verdict (Ground One)

4                   Zhuk claims, based on the declarations obtained after trial, that the jury

5   improperly engaged in "vote trading" to resolve the case, resulting in a compromise verdict.

6   According to the declarations, the jurors reached a compromise whereby Zhuk would be found

7   guilty of murder, but not the remaining charges.

8                   In support of this claim, Zhuk cites *Allen v. United States*, 164 U.S. 492, 501

9   (1896) and *Smith v. Phillips*, 455 U.S. 209, 217 (1982) for the rules that a jury's verdict "must be

10  the verdict of each individual juror" (*Allen*) and that "due process means a jury capable and

11  willing to decide the case solely on the evidence before it" (*Smith*).  These cases, addressing a

12  jury instruction (*Allen*) and potential juror bias (*Smith*), do not clearly establish a constitutional

13  right to prevent a jury from trading votes or entering into a compromise on various counts to

14  reach a verdict in a criminal case.

15                  In *Allen*, the Supreme Court found no error in a supplemental jury instruction that

16  urged the minority to consider the views of the majority and ask themselves whether their own

17  views were reasonable under the circumstances.  *Allen*, 164 U.S. at 502.  The Court explained:

18              While, undoubtedly, the verdict of the jury should represent the
                opinion of each individual juror, it by no means follows that
19              opinions may not be changed by conference in the jury room.  The
                very object of the jury system is to secure unanimity by a
20              comparison of views, and by arguments among the jurors
                themselves.  It certainly cannot be the law that each juror should
21              not listen with deference to the arguments, and with a distrust of
                his own judgment, if he finds a large majority of the jury taking a
22              different view of the case from what he does himself.  It cannot be
                that each juror should go to the jury room with a blind
23              determination that the verdict shall represent his opinion of the
                case at that moment, or that he should close his ears to the
24              arguments of men who are equally honest and intelligent as
                himself.

25

26  *Allen*, 164 U.S. at 501.

                                                11

1      In *Smith*, the Supreme Court decided whether, under the circumstances, a juror in

2   a criminal case was sufficiently impartial when that juror applied for employment with the

3   prosecutor's office during the trial.  *See Smith*, 455 U.S. at 215-20.  The *Smith* majority reversed

4   the decision of the United States Court of Appeal, which had ordered a new trial, finding no error

5   of constitutional dimension.  *Id*. at 221.

6      Zhuk additionally cites *Stein v. New York*, 346 U.S. 156, 178 (1953) and *Arizona*

7   *v. Washington*, 434 U.S. 497, 509 (1978) as holding that compromise verdicts are generally

8   condemned.  In *Arizona v. Washington*, the Supreme Court recognized that where a trial court

9   "fails to discharge a jury unable to reach a verdict after protracted and exhausting deliberations,

10  there exists a significant risk that a verdict may result from pressures inherent in the situation

11  rather than the considered judgment of all the jurors."  *Arizona v. Washington*, 434 U.S. at 509.

12  In *Stein*, the Court stated in dicta that "[c]ourts uniformly disapprove compromise verdicts but

13  are without other means than admonitions to ascertain or control the practice."  *Id*. at 178

14  (overruled in part on other grounds by *Jackson v. Denno*, 378 U.S. 368 (1964)).  The *Stein* court

15  went on to explain that

16          courts [have not] favored any public or private post-trial inquisition
            of jurors as to how they reasoned, lest it operate to intimidate, beset
17          and harass them.  This court will not accept their own disclosure of
            forbidden quotient verdicts in damage cases. [Citation.] Nor of
18          compromise in a criminal case whereby some jurors exchanged
            their convictions on one issue in return for concession by other
19          jurors on another issue.  *Hyde v. United States*, 225 U.S. 347, 32
            S.Ct. 793, 56 L.Ed. 1114.  'If evidence thus secured could be thus
20          used, the result would be to make what was intended to be a
            private deliberation, the constant subject of public investigation; to
21          the destruction of all frankness and freedom of discussion and
            conference.' [Citation.]
22

23  *Stein*, 346 *U.S.* at 178.  The *Stein* case addressed the issue whether determination of the

24  voluntariness of confessions should be made by judges or juries.  Neither *Stein* nor *Arizona v.*

25  *Washington* clearly establish a rule that vote trading and compromise verdicts in criminal cases

26  are constitutionally unacceptable.

1    Dicta in the Supreme Court's cases on inconsistent verdicts appears to indicate the

2  contrary: that compromise verdicts do not violate the constitution.  In the case *Dunn v. United*

3  *States*, the Supreme Court held that a criminal defendant convicted by a jury on one count could

4  not attack that conviction because it was inconsistent with the jury's verdict of acquittal on

5  another count.  *Dunn*, 284 U.S. 390 (1932); *see also Harris v. Rivera*, 454 U.S. 339, 345 (1981)

6  ("Inconsistency in a verdict is not a sufficient reason for setting it aside.").  Rather, inconsistent

7  verdicts may be viewed as a demonstration of the jury's leniency:

8          The most that can be said in such cases it that the verdict shows
           that either in the acquittal or the conviction the jury did not speak
9          their real conclusions, but that does not show that they were not
           convinced of the defendant's guilt.  We interpret the acquittal as no
10         more than their assumption of a power which they had no right to
           exercise, but to which they were disposed through lenity.

11

12  *Id*. at 393.  "[A]s the above quote suggests, inconsistent verdicts- even verdicts that acquit on a

13  predicate offense while convicting on the compound offense- should not necessarily be

14  interpreted as a windfall to the Government at the defendant's expense."  *United States v. Powell*,

15  469 U.S. 57, 64 (1984).  "It is equally possible that the jury, convinced of guilt, properly reached

16  its conclusion on the compound offense, *and then through mistake, compromise, or lenity*,

17  arrived at an inconsistent conclusion on the lesser offense."  *Id*. (emphasis added).  In such a

18  situation, nothing in the Constitution requires that the defendant receive a new trial as a matter of

19  course.  *Id*. at 65.

20         In *Powell*, the Supreme Court rejected

21         as imprudent and unworkable, a rule that would allow criminal
           defendants to challenge inconsistent verdicts on the ground that in
22         their case the verdict was not the product of lenity, but of some
           error that worked against them.  Such an individualized assessment
23         of the reason for the inconsistency would be based either on pure
           speculation, or would require inquiries into the jury's deliberations
24         that courts generally will not undertake.

25  *Powell*, 469 U.S. 57, 66-67.  "[A] criminal defendant already is afforded protection against jury

26  irrationality or error by the independent review of the sufficiency of the evidence undertaken by

1   the trial and appellate courts." *Id*. at 67.  Further safeguards against jury irrationality are

2   unnecessary. *Id*.

3              Thus, *Dunn* and the Court's subsequent cases establish "the unreviewable power

4   of a jury to return a verdict of not guilty for impermissible reasons."  *Harris v. Rivera*, 454 U.S.

5   339, 346 (1981); *see also Ulster County Court v. Allen*, 442 U.S. 140, 168 (1979) (Burger, C.J.,

6   concurring) (noting the jury "reached what was rather obviously a compromise verdict," and

7   "[c]ourts have long held that in the practical business of deciding cases the factfinders, not unlike

8   negotiators, are permitted the luxury of verdicts reached by compromise."); *United States v.*

9   *Marques*, 600 F.2d 742, 747 (9th Cir. 1979) (noting "the compromise verdict, if there was one,

10  was reached by the jurors on their own" and "[w]e therefore reject appellants' contention that

11  because the verdict was allegedly compromised, it should be reversed."); *United States v. Green*,

12  523 F.2d 229, 235-36 (2nd Cir. 1975) ("Evidence that the jurors on their own agreed to a

13  compromise verdict does not warrant a new trial.").

14              In *United States v. Straach*, a case similar to Zhuk's, the defendant filed a motion

15  for mistrial based on two affidavits from jurors indicating that they had been forced to

16  compromise on the verdict as a result of pressure from other jurors.  *Straach*, 987 F.2d 232, 241

17  (5th Cir. 1993).  The United States Court of Appeals for the Fifth Circuit rejected the evidence as

18  a possible basis for a juror misconduct claim, observing:

19          Even a compromise verdict cannot be challenged later by a juror if
            a reasonable jury could have found that the conviction was
20          supported by the evidence beyond a reasonable doubt.  *United*
            *States v. Dotterweich*, 320 U.S. 277, 278-79, 64 S.Ct. 134, 135, 88
21          L.Ed. 48 (1943); [other citation omitted].  Although testimony by
            jurors about "objective jury misconduct" is admissible in some
22          jurisdictions, it generally is not admissible in the federal courts.
            *See* Notes following Fed. R.Evid. 606(b).  *See also Tanner v.*
23          *United States*, 483 U.S. 107, 117, 107 S.Ct. 2739, 2745, 97
            L.Ed.2d 90 (1987).  Although two jurors came forward after the
24          verdicts had been returned and recorded, stating that they had
            maintained throughout the jury's deliberations that defendant was
25          not guilty on all counts, but had been pressured into compromising
            their verdicts on counts two and five, this "pressure" cannot count
26          as an outside influence.  *See, e.g.*, *United States v. Vincent*, 648

14

1    F.2d 1046, 1049-50 (5th Cir. 1981).

2   *Straach*, 987 F.2d at 241-42.

3    In sum, the United States Supreme Court has never held that a jury violates a

4   criminal defendant's constitutional rights by reaching a compromise verdict that is supported by

5   the evidence, and such a conclusion does not flow from the Court's clearly established law.

6   Absent such precedent, it cannot be said that the state court's decision was contrary to, or an

7   unreasonable application of federal law.  *See Wright v. Van Patten*, 552 U.S. 120, 124-25 (2008).

8    b.    Consideration of Extraneous Information (Ground Two)

9    For his second ground, Zhuk contends the jurors, in addition to bartering their

10  votes, engaged in misconduct by improperly discussing or considering various extraneous

11  information.  In particular, Zhuk contends (1) the jurors improperly discussed the penalties he

12  faced; (2) the jurors improperly discussed the prospect of "sending a message" (with their

13  verdict) to Vlasov's jury; and (3) Juror No. 6, a legal secretary, improperly interjected her

14  purported legal expertise and previous life experience to demonstrate that the jury was legally

15  obligated to convict Zhuk of murder.  Each contention will be addressed in turn.

16   The Sixth Amendment guarantee of a trial by jury requires the jury verdict to be

17  based on the evidence produced at trial.  *Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965).

18  "Once a juror has breached [the duty to consider only evidence presented in open court] by

19  infecting the deliberations with extrinsic material, a new trial is warranted if there is a

20  'reasonable possibility' that it could have affected the verdict."  *Bayramoglu v. Estelle*, 806 F.2d

21  880, 887 (9th Cir. 1986), *cert. denied*, 456 U.S. 962 (1982) (quoting *Fahy v. Connecticut*, 375

22  U.S. 85, 96-87 (1963).  "The 'reasonable probability' test is equivalent to the harmless error rule

23  for constitutional errors."  *Bayramoglu*, 806 F.2d at 887 n.7 (citing *United States v. Bagley*, 641

24  F.2d 1235, 1241 (9th Cir. 1981); *Estrada v. Scribner*, 512 F.3d 1227, 1235 (9th Cir. 2008)

25  (distinguishing between case where jury considered extraneous information, which is subject to

26  harmless error analysis, and case where a juror is biased, which is structural error).

15

First, as to the discussion of penalties during deliberations, the California Court of Appeal held that such a discussion by the jurors did not amount to reversible error. *People v. Zhuk*, *supra*, at 17. The Ninth Circuit Court of Appeals has indicated that a juror's interjection of extraneous information about penalties into deliberations constitutes error that could potentially be of constitutional dimension. *See Bayramoglu*, 806 F.2d at 887-88 (unless properly mitigated, discussion of possible sentence is impermissible extrinsic evidence); *Silva v. Woodford*, 279 F.3d 825, 834 (9th Cir. 2002) (juror discussion of the possibility of parole for the defendant introduces impermissible extrinsic evidence and raises a risk of constitutional defect serious enough to warrant issuance of a "certificate of appealability"). In *Grotomeyer v. Hickman*, the Ninth Circuit explained:

> A foreman's speculation about likely sentencing, particularly where the speculation is likely to be prejudicial to the defendant, is error even where there is not some specific, tangible extrinsic evidence introduced into deliberations. First, the introduction of extrinsic evidence involving sentencing into jury deliberations is error. Second, the simple fact that a juror statement is based upon past experience does not immunize it from Sixth Amendment inquiry.
>
> We share the *Silva* and *Bayramoglu* courts' concerns regarding speculation about sentencing by jurors, because such speculation may distort their evaluation of the evidence regarding guilt.

*Grotomeyer*, 393 F.3d at 880 (footnotes omitted). In *Grotomeyer*, the Ninth Circuit went on to hold, however, that the jury's improper discussion was mitigated by the court's instructions:

> However, such speculation was also the subject of the routine admonition by the judge in the instructions, "do not discuss or consider the subject of penalty or punishment. That subject must not in any way affect your verdict." Having been so admonished, the other jurors were well armed to disregard the remark, and to remind the foreman that she should not decide the case based on what she thought would happen after sentencing. We ordinarily assume that jurors follow their instructions. The remark is much like the remarks, or, at the least, unexpressed assumptions, that jurors routinely make about punishment in criminal cases and insurance in civil cases. That is why the admonition is generally given.

1    *Id*. Ultimately the Ninth Circuit denied relief in *Grotomeyer*, holding that the state court's

2    rejection of the jury misconduct claim was not contrary to or an unreasonable application of

3    clearly established federal law as determined by the Supreme Court. *Id*. at 881.  Likewise, in

4    *Bayramoglu*, relief was denied for a lack of prejudice. *Bayramoglu*, 806 F.2d at 888 ("We

5    therefore conclude that [the juror's] misconduct was harmless beyond a reasonable doubt; that is,

6    that there is not a "reasonable possibility" that her brief introduction of the subject of penalties

7    affected the jury's ultimate verdict of guilty of second degree murder.").

8         Zhuk's jury was instructed not to consider punishment in their deliberations (RT

9    at 6173-74), and it is presumed that ultimately they followed this instruction, despite any

10    improper discussion during deliberations.  Nothing in this case indicates a reasonable possibility

11    that the jurors' improper discussion of punishment actually affected their verdict. *See*

12    *Bayramoglu*, 806 F.2d at 888.

13         In any event, Zhuk fails to identify Supreme Court precedent clearly establishing a

14    constitutional right prohibiting a jury in a non-capital criminal proceeding from discussing or

15    considering punishment in their deliberations.  Zhuk further fails to demonstrate that the

16    California Court of Appeal's rejection of this claim unreasonably applied the Supreme Court's

17    general standards regarding consideration of extraneous information during deliberations. *See*,

18    *e.g.*, *Straach*, 987 F.2d at 242 (holding that the jurors' improper discussion about penalties did

19    not warrant reversal because no information came from outside sources).

20         Zhuk's allegation that the jury based their verdicts, in part, on the message it

21    would send to Vlasov's jury was also rejected by the California Court of Appeals after all

22    supporting evidence for the allegation was deemed inadmissible.  Applying section 1150 of the

23    California Evidence Code, the state court refused to consider any evidence that was reflective of

24    the jury's thought processes. *People v. Zhuk*, *supra*, at 17.   The state court's rejection on this

25    basis was consistent with federal law. *See Sassounian v. Roe*, 230 F.3d 1097, 1108 (9th Cir.

26    2000) ("A long line of precedent distinguishes between juror testimony about the consideration

of extrinsic evidence, which may be considered by a reviewing court, and juror testimony about the subjective effect of evidence on the particular juror, which may not.") (citing, *inter alia McDonald v. Pless*, 238 U.S. 264, 267-68 (1915) (noting that the finality of verdicts necessarily precludes using evidence of jurors' mental processes to impeach verdicts)); *see also* Fed. R. Evid. 606(b) (prohibiting use of juror testimony to impeach a verdict as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions influencing the jurors... or concerning the juror's mental processes...).  The state court's rejection of this portion of the juror misconduct claim for lack of supporting evidence was not contrary to, or an unreasonable application of clearly established federal law.

Finally, the state court rejected on the merits Zhuk's allegation that Juror No. 6 interjected purported legal expertise and previous life experiences into the deliberations. Although the comments amounted to an injection of external information in the form of a claim of expertise or specialized knowledge which constituted misconduct, the state court held it was not reasonably probable that the comments were prejudicial.  *People v. Zhuk*, *supra*, at 14-15.

As set forth, juror misconduct is subject to harmless error review.  *See Estrada*, 512 F.3d at 1235.  Assuming Juror No. 6 improperly injected extraneous information into the deliberations, her statements did not have a substantial and injurious effect or influence in determining the verdict.  The state courts reasonably concluded that Juror No. 6's statements essentially incorporated her assessment of facts to her understanding of the law.  The trial court found that her statements were not prejudicial because the court had specifically instructed the jury (in response to the jury question) that the jury could find Zhuk not guilty of murder but guilty on the remaining counts.  Given the specific and directed way in which the trial court answered the question, and the relatively close proximity in time in which Juror No. 6 allegedly made the contrary statements at issue, this finding was reasonable and it is not likely the remaining jurors credited Juror No. 6's statements over the court's response.

1          Moreover, as determined by the court of appeal, Juror No. 6's assertions were not

2   completely inaccurate:

3          The jury questioned whether it could find defendant not guilty of
           felony murder, but guilty of attempted carjacking and robbery.  The
4          trial court answered it could.  Juror No. 6 argued that given the
           evidence before it, the jury could not render such a verdict.

5

6          In effect, the trial court correctly informed the jury it could
           *theoretically* reach such a verdict, but instructed the jury to
7          carefully review the felony murder instructions.  During
           deliberations Juror No. 6 argued the *evidence compelled* a verdict
8          of guilty on the felony murder count.  Although it was misconduct
           to couch her opinion in terms of expertise, Juror No. 6's assertion
9          that the jury had to convict defendant of felony murder if it found
           him guilty of the attempted carjacking and robbery was supported
10         by the evidence and instructions.  In this sense, Juror No. 6's
           comments were not inaccurate or misleading.

11  *People v. Zhuk*, *supra*, at 15.

12         The state court's finding of no prejudice is not contrary to, or an unreasonable

13  application of clearly established federal law, nor based on an unreasonable determination of the

14  facts.  No relief is warranted for any of Zhuk's allegations of juror misconduct.

15         B.     Instructional Error (Ground Three)

16         Zhuk's jury was instructed on felony murder and the aiding and abetting theory of

17  felony murder, in relevant part, as follows:

18         In order to prove this crime, each of the following elements must
           be proved, One, a human being was killed, Two, the killing was
19         unlawful, and Three, the killing occurred during the commission or
           attempted commission of a carjacking and or robbery.

20
           The unlawful killing of a human being, whether intentional,
21         unintentional or accidental which occurs during the commission or
           attempted commission of the crime of a carjacking and or robbery,
22         is murder of the first degree when the perpetrator had the specific
           intent to commit that crime.

23
           The specific intent to commit a carjacking and or robbery and the
24         commission or attempted commission of that crime must be proved
           beyond a reasonable doubt.

25
           If a human being is killed by any one of several persons engaged in
26         the commission or attempted commission of the crime of

19

> carjacking and or robbery, all persons who either directly and
> actively commit the act constituting that crime or who with
> knowledge of the unlawful purpose of the perpetrator of the crime,
> and with the intent or purpose of committing, encouraging or
> facilitating the commission of the offense, aids, promotes,
> encourages or instigates by act or advice, in [its] commission are
> guilty of murder of the first degree, whether the killin gis
> intentional, unintentional, or accidental.

(RT at 6162-63; *see also* CALJIC Nos. 8.10, 8.21, and 8.27.)  Zhuk contends the trial court failed

to additionally instruct the jury that it could not find him guilty of murder on this theory unless he

formed the intent to aid and abet Vlasov's commission of robbery/carjacking before Vlasof shot

Cindy Chung.  Zhuk argues that the trial court had a sua sponte duty to instruct on the timing of

his intent in this manner because substantial evidence at trial supported a theory that he did not

become aware that Vlasov killed Cindy Chung until they left the scene.

Zhuk presented this ground on appeal but the state court rejected his claim of

error.  The court of appeal recognized that under California law an aider and abettor is liable for

first degree murder committed by anyone else engaged in the felony only if the requisite intent

was formed before or during commission of the offense.  *People v. Zhuk*, *supra*, at 17.

Nevertheless, the state court distinguished Zhuk's case from one in which reversible error was

found for failure to instruct on the timing of an accomplice's intent:

> In [*People v. Esquivel*, 28 Cal.App.4th 1386 (1994)], a jury
> convicted the defendant of first degree murder based on the felony
> murder doctrine and the defendant's participation in the underlying
> robbery as an aider and abettor.  The defendant appealed, arguing
> the court erred in failing to instruct that if the defendant became an
> aider and abettor to the robbery after the victim had been fatally
> wounded, he could not be found guilty of felony murder.
> (*Esquivel*, *supra*, 28 Cal.App.4th at p. 1392, 34 Cal.Rptr.2d 324.)
> The appellate court reversed.  (*Id*. at p. 1400, 34 Cal.Rptr.2d 324.)
>
> Two major differences stand out between the present case and the
> scenario in *Esquivel*.  In *Esquivel*, the prosecution argued to the
> jury that the victim was already dead when the property was taken,
> but that if the defendant participated in the robbery he was guilty of
> felony murder *even if* he did not join the plan to rob until after the
> murder.  (*Esquivel*, *supra*, 28 Cal.App.4th at p. 1394, 34
> Cal.Rptr.2d 324.)  The appellate court noted this statement was

incorrect, and that if the design to take property from the victim is formed after the victim has already been killed or mortally wounded, the felony-murder doctrine does not apply.  (*Id*. at p.1396, 34 Cal.Rptr.2d 324.)

Here, neither party argued that defendant formed the intent to participate in the carjacking or robbery after Cindy's death.  The prosecution argued defendant formed the intent at the time or before the trio spotted Cindy's car on the freeway.  Defendant maintained he did not know, much less intend, that Vlasov would steal Cindy's car.  Defendant stated he sold the gun to Vlasov prior to the murder, denied spotting Cindy's car on the freeway, stated he could not hear the shots because of the car radio, and did not learn of the shooting until much later.  Defense counsel, in closing argument, reiterated defendant's lack of knowledge and absence of shared intent.

In *Esquivel*, the appellate court also concluded evidence in the record could reasonably support an inference that the defendant did not form the intent to participate in the robbery until after the victim was dead.  (*Esquivel, supra*, 28 Cal.App.4th at p. 1397, 34 Cal.Rptr.2d 324.)  The trial court had noted there was no testimony that the defendant entered the property to commit a felony.  Various witnesses testified the defendant stated the perpetrator struck the victim after being asked to leave.  The defendant fled in fear during the attack.  The appellate court found this evidence sufficient for the jury to be instructed on the timing of the defendant's intent.  (*Id*. at pp. 1397-1398, 34 Cal.Rptr.2d 324.)

The present case offers no such evidence to support the inference that defendant formed the intent to participate in the carjacking after Cindy's death.  Defendant cites Vlasov's statement, "Let's get out of here," following the shooting; Vlasov's firing of the gun out of the car window; and Vlasov's later statement to defendant that he shot at the white BMW as evidence defendant did not form the intent to carjack until after the shooting.  In addition, defendant claims the testimony that he spotted Cindy's car while he was driving northbound on the freeway was geographically impossible.

Unfortunately, defendant's efforts to construct a plausible scenario of his joining the carjacking after the fact ignores his own testimony.  Defendant testified he had no knowledge or intent even after the shooting, but only learned of the murder much later.  He testified he did not believe Vlasov immediately after the murder when he told defendant about shooting at the BMW, even though defendant testified Vlasov said "Let's get out of here" when he returned to the car.  Therefore, no evidence reflected an intent by defendant to participate in the crime after the fact.  The evidence did not support an additional instruction about the scope of complicity for late-joining accomplices.  The court had no sua sponte duty to give additional instructions that defendant's intent

1    had to have been formed before the shooting.

2  *People v. Zhuk*, *supra*, at 18-19.

3          A claim of instructional error does not raise a cognizable federal claim unless the

4  error, considered in context of all the instructions and the trial record as a whole, "so infected the

5  entire trial that the resulting conviction violates due process."  *Estelle v. McGuire*, 502 U.S. 62,

6  71-72 (1991); *Henderson v. Kibbe,* 431 U.S. 145, 152-55, n.10 (1977); *Cupp v. Nauhten,* 414

7  U.S. 141, 146-47 (1973).  In addition, on federal habeas corpus review, no relief can be granted

8  without a showing that the instructional error had a "substantial and injurious effect or influence

9  in determining the jury's verdict."  *Calderon v. Coleman*, 525 U.S. 141, 147 (1998) (citing

10  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  "It is the rare case in which an improper

11  instruction will justify reversal of a criminal conviction when no objection has been made in the

12  trial court" (*Kibbe*, 431 U.S. at 154), as the case is here.  *See also Boyd v. United States*, 271 U.S.

13  104, 108 (1925) ("after permitting [the instruction] to pass as satisfactory then, the defendant is

14  not now in a position to object to it").  In addition, an omitted instruction is less likely to be

15  prejudicial than a misstatement of the law.  *Id*. at 155.

16          Under this demanding standard, Zhuk's claim fails.  Erroneous omission of an

17  instruction that the mens rea for aiding and abetting had to be formed before the offense occurred

18  did not implicate the fairness of Zhuk's trial.  The state appellate court reasonably found that

19  reversal was not warranted because insufficient evidence supported the giving of such an

20  instruction and because the defense theory of the case did not require such an instruction.

21          Specifically, the prosecution's theory was that Zhuk formed the intent to aid and

22  abet before the attempted carjacking and murder occurred; Zhuk's theory at trial was that he did

23  not know of his co-defendant's criminal purpose until much later.  The instructions that were

24  given required the prosecution to prove that Zhuk had specific intent to aid and abet a carjacking.

25  Despite Zhuk's argument, the evidence at trial could not have led a rational jury to find that he

26  formed an intent to aid and abet only *after* commission of the offense.  The given instructions

22

1  adequately covered the defense theory of the case that Zhuk was not a knowing participant and

2  no fundamental unfairness is shown. *See generally Duckett v. Godinez*, 67 F.3d 734, 745-46 (9th

3  Cir. 1995) (When a trial court's instructions adequately encompass the defense theory of the

4  case, the failure to give specific instructions on that theory does not violate due process.).

5          For the same reason, no reasonable likelihood exists that omission of the

6  instruction affected the verdict. *See Brecht*, 507 U.S. at 638; *Hart v. Stagner*, 935 F.2d 1007,

7  1012-13 (9th Cir. 1991) (defective instruction on aiding and abetting which allowed jury to infer

8  intent and relieved prosecution of burden of proving mens rea of charged crime was harmless

9  where facts did not permit a rational conclusion that defendant did not have the requisite intent);

10 *Hennessy v. Goldsmith*, 929 F.2d 511, 517 (9th Cir. 1991) (instructional error on intent harmless

11 where not relevant to defense presented at trial).

12                              VI.  CONCLUSION

13          For the foregoing reasons, IT IS HEREBY RECOMMENDED that the application

14 for writ of habeas corpus be DENIED.

15          These findings and recommendations are submitted to the United States District

16 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-

17 one days after being served with these findings and recommendations, any party may file written

18 objections with the court and serve a copy on all parties.  Such a document should be captioned

19 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

20 shall be served and filed within seven days after service of the objections.  Failure to file

21 objections within the specified time may waive the right to appeal the District Court's order.

22 *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir.

23 1991).

24 DATED: September 6, 2011

                                    *Charlene H. Sorrentino*
25                                  CHARLENE H. SORRENTINO
                                    UNITED STATES MAGISTRATE JUDGE
26

                                        23